May it please the Court, Steve Bushong appearing on behalf of the appellants, respondents, the State of Oregon Student Assistance Commission and others. The issue in this case is whether the trial court abused its discretion in awarding nearly $450,000 in attorney fees to a plaintiff who prevailed on a single civil rights claim, a claim for monetary damages and received nominal damage award of $1. Now we know from the Supreme Court's case of Farrar v. Hobby that in order to recover attorney fees in such circumstances, there has to be something more than just a nominal damages award. And I think the central issue in this case turns on whether there is something more, what that something more can be, and whether there is a something more here that would legally entitle the plaintiff to the award. And I think there are three factors. I want to turn to those three factors because I think by looking at those three factors, we can see how the district court misapplied the law. His award was based on a misapplication of the law. First factor is the extent of relief obtained by the plaintiff. This is in Farrar itself. The majority opinion says this is the most critical factor. The district court must look at that. And then the other two factors are identified by Justice O'Connor in her concurrence, which this court has applied in prior cases as additional factors to look at, and that is the significance of the legal issue on which the plaintiff prevailed. And third, whether the litigation served a public purpose. I'm going to address each one of those factors in this morning's argument. First, the extent of relief. This is, as I said, the critical factor identified by the Farrar majority. And here I think the critical question is the court should be applying an objective test. Look at what relief was sought objectively in the pleadings. What was the subjective motivation for the plaintiff's lawsuit? And the reason I say that is I struggled with this very issue until I read carefully the Mercer v. Duke University case, which I submitted as supplemental authority last week, Fourth Circuit opinion. And there in Mercer, the court concluded in applying this factor, the critical factor, that the district had erred, had committed legal error by focusing on the plaintiff's subjective motives in pursuing the case. And I think here we have the same situation. Because after the declaratory and injunctive relief claims were dismissed, the only claim left in the case, and the reason the case went forward from that point, was a claim for monetary damages. And that's the reason the claim proceeded. If the case had ended right when the declaratory and injunctive relief claims had been dismissed, clearly there would be no attorney fee award, no basis for awarding attorney fees. But the plaintiff continued to pursue her claim for monetary damages. And that's the objective relief that she sought. And she obtained one dollar on that claim. Let me just make certain I have the scenario right. When the declaratory and injunctive relief provisions dropped out, I take it that was soon after the Oregon statute was changed, and she was advised that her university was, at this point the commission had the authority to recognize degrees from institutions that were comparable, and her institution was deemed comparable, since there was no longer going to be a question about her degree. What was the time period that we're talking about there between the change in statute and the commission's determination and the dropping of the injunctive relief provisions? I don't know exactly. It's laid out in our briefs. I know that the decision to dismiss the declaratory and injunctive relief claims was made shortly after, within a matter of days, shortly after the approval of the university under the new statute. So there was nothing left of the case except for the damage claim. But you have the scenario correct? Was there a causal connection between the initiation of this lawsuit and the change in the state's position? There is no evidence of a causal connection in this record. Was there any coincidence? Certainly when you look at the prior statute, you can see that the prior statute, there was a problem under the prior law, and that is that the office had no authority, basically, to do what it eventually did under the new statute. And I think it needed that authority. But there is no evidence in this record of a causal connection. And the district court really declined to find a connection. Exactly. I'm going to turn to the second factor, because I think that first factor clearly weighs in favor of denial of a fee award. And I think the legal error that the district court committed was by looking at the subjective motivations of the plaintiff in pursuing the litigation further. That was a good thing for the plaintiff, and we're not denying that. But I think as a matter of law, that should not be considered, and the Mercer case supports that position. What were her subjective motivations? I think she wanted to be vindicated. I think she felt mistreated by the office. A number of factors. I think she believed that the office was singling her out improperly, and I think that was the court's finding. The second factor, the significance of the legal issue on which the plaintiff prevailed. And here, I think, is the second area in which the district court misapplied the law. And again, I would compare this case to Mercer versus Duke University, because there I can see that there's a significant legal issue that the plaintiff prevailed on. In the Mercer opinion, the Fourth Circuit described that as a landmark ruling in a case of first impression. And here, what we have is a finding. The plaintiff prevailed because the court found that one man singled her out for enforcement for improper reasons. And it's the improper, a couple of important points there. One is it's one man singling out one person. But second, the improper reasons, liability in this case was based, it hinges, on the subjective motivations of Mr. Contreras. And that's different from Mercer, where you have a legally significant ruling. Here the liability is based on the subjective motivation of one individual. And so I would compare this case as more like two cases, actually three cases, more like Farrar itself, which both parties addressed. And it's also more like two other cases in which appellate courts have found that fee awards in comparable circumstances amount to an abuse of discretion. Those two cases are the Sixth Circuit opinion in, and I'm afraid of the pronunciation, Pouillon versus Little. To briefly talk about that case, it's a 2003 decision from the Sixth Circuit. That case involved an abortion protester who was making a protest on the steps of City Hall. And a police officer stopped the protester, arrested him, put him into custody. He brought a civil rights claim, violation of his First Amendment rights, clearly was. And the jury so found that there was a violation, awarded nominal damages of a dollar. And the district court said, yeah, this is an important issue, and awarded $35,000 in attorney fees. The reason it was an abuse of discretion in that case, I think, is because liability basically hinged on the actions of one person, the officer, who engaged in improper conduct. I think this case, the Benton case, is like Pouillon. It's also like the other case I wanted to mention, Johnson versus City of Aiken, a Fourth Circuit decision in 2002. These cases are cited in our briefs. That case, Johnson is very much like, the facts of Johnson is very much like the facts of Romberg versus Nichols, which is a prior Ninth Circuit case. Except in Romberg, the court just affirmed the district court's denial of fees. In Johnson versus City of Aiken, the police wrongfully invaded someone's home. They threw in an exploding device, and masks on, and it was, you can imagine the scene. Very much like Romberg versus Nichols, the police wrongfully invaded a house in violation of rights. And the court there, again, went to a jury, nominal damage award, $1. The district court awarded $98,000 in attorney fees, and the Fourth Circuit reversed as an abuse of discretion. Again, I think, not because the invasion of the home, the constitutional rights, the civil rights it issued, they were important, just as Ms. Benton's First Amendment rights are important in this case. But because it involved the actions of a handful of police officers in that case. I'm not sure this case is quite the same. Mr. Contreras is director, administrator, I forget the title, but he is an official with the commission, and the commission now has the responsibility for determining what institutions have programs that are comparable to accredited institutions. So it's, I don't know that it's quite the individual officer going off in a frolic someplace. This is somebody who has ongoing responsibility and could be expected to have learned something from this experience as he fulfills his future responsibility. I don't think that, I don't agree with that, and I'll explain that. Mr. Contreras, actually at the time, he had broad discretion to do what he did, to single out Ms. Benton for treatment, just like a police officer has discretion to make arrests. He had discretion in the sense of you can choose to write a ticket, choose to cite somebody or not, but under the statute, as I understood it, statute basically said either you're accredited or you're not, that's the end of it. So his discretion came in actually enforcing the provision. After the amendment, the commission at least, perhaps not him individually, but the commission makes decisions with regard to what programs are comparable or not. And I think that really relates to the third question, whether that, the district court cited this, this limitation on his discretion in making comparable decisions might serve a public purpose. And I think that's wrong, because under the new statute, the statutory change is significant. Under the new statute, the commission has what used to be this broad authority with kind of unlimited discretion. Now the commission has fact-finding authority only, the authority to determine whether a particular institution, unaccredited, meets the standards of academic quality established by the U.S. Department of Education. That's a fact-finding role. It engages in an investigation, a determination, as a matter of fact, whether the institution meets those standards. So we have standards established. The commission didn't lose the authority it had before, did it? No. So you can't say that their authority is narrower than it was before. It has the same responsibility for enforcement. It now has this additional ability to determine that certain unaccredited institutions don't wind up on the blacklist, based on fact-finding, but fact-finding with a standard comparable, which sounds to me like it's a piece of flexibility. It is different, though, and I said no too quickly. It is different because whereas before the commission and Mr. Contreras, there were no standards to govern his decision, his application of the statute, now the only time a degree from an unaccredited institution can not be used is if the commission finds that the institution issuing the degree doesn't meet the standards of academic quality. So now it is very much constrained. That's the difference, I think, between the current law and the prior law. I think I get what you're saying, although there's still nothing that would, I mean, suppose this discussion, for example, that there are a number of teachers in the colleges with degrees from four institutions that haven't gone through the process, and so the argument was that the commission never did anything about them, well, presumably the same possibility is there now. You could have somebody with a degree from an institution that hasn't formally been found comparable, but still the commission has to do something if it wants to try to enforce the provision, so if it doesn't enforce it, it's just where it was before. If it's a degree from a United States institution, then the commission would have to go through the determination that it doesn't, that the degree, the institution doesn't meet the standards aside from that. That gets me to the third factor, which is the public purpose, and again, I think this is an error of law, I think based on the discussion I just had with Judge Clifton, and that is that the purpose that was identified by the district court as a public purpose really isn't. He identified, the district court identified the purpose of his ruling, it served the public purpose because it limited the discretion that remained in the agency, and I think what happened is that discretion was limited not by the judgment entered in this case, but by the statutory change, which changed what was a kind of a standard list review discretion, with wide open discretion and no standards, into a fact-finding function with clear specified instructions and standards. But don't they still have a lot of discretion, because the word comparable is kind of flexible. You know, it's I think a question of fact that there would have to be evidence taken on what's comparable to the standards established by the Department of Education, and it would be subject to judicial review under the Oregon Administrative Procedures Act, not the type of just standard list, you know, who can I single out? There would have to be that kind of analysis, and I think I agree comparable is what's comparable, and that always will come down to ultimately a decision that will be made. So you're saying there's still a lot of discretion in that commission? I don't call it discretion, because I think in terms of the Oregon administrative process in which the legislature delegated fact-finding authority to the commission, and so that would be subject to judicial review for substantial evidence. If there was substantial evidence that an institution did in fact meet the standards established by the Department of Education, then it should be, there wouldn't be any discretion. I think the commission would have to approve under Oregon law. That's all the main points I wanted to make in my opening comments. I'd like to reserve the rest of my time for rebuttal, unless there are further questions. Thank you. It pleases the Court. I'm Wendell Byrd, representing Melinda Benton, who is a community college professor who is the subject of this case. Part of the disconnect that you saw in the briefs between Mr. Bushon's position and mine is the question whether declaratory judgment was issued. Judge Hogan did not agree with the point that he made in post-trial briefing about attorney fees, that there was no declaratory judgment mentioned. And if I may, I'd simply like to start with what Judge Michael Hogan said about what he was doing. First, the Order on Fees itself, ER 133, says, stressed, quote, the success of plaintiff in obtaining a declaration that contrasts his conduct in singling out plaintiff's degree for regulation because of bias toward the viewpoints of the institution from which they were received. And so Judge Hogan, in the Order on Fees, called what he had done a declaration. There's no judgment. There's no declaratory judgment. Your Honor, we asked Judge Hogan to add that language from his accompanying findings. He wouldn't do it. He chose not to, saying that the award of monetary damages could only occur because he had made the determination that there was a violation of constitutional rights. And in doing so, he again called it a declaration. That Order... You can take this out of any other 1983 nominal damages case. To have even nominal damages, you have to have an adjudication that there's been a violation. So for our and all the other cases, you have exactly the same kind of declaration, yet the Supreme Court says that's not good enough. Your Honor, I'd suggest that those are different in that Judge Hogan, for reasons of his own thinking, did not think it necessary to add declaratory language to the judgment document because it was in the accompanying conclusions of law findings of fact. And here's what he said on the motion that you were just asking about. That's an answer to my question. How does that make this case different from Farrar or the other cases where there are nominal damages? Because in fact, a declaratory judgment was entered in the findings of fact conclusions of law accompanying the document caption judgment that said one dollar nominal damages. Can you give me a page number where I can find such a declaration, such a declaratory judgment? Yes, sir. That would be ER 71. And again, this is the findings of fact conclusions of fact that are accompanying the judgment. And here, ER 71. So you're saying findings of fact are the same as the judgment? No, Your Honor. I'm not suggesting that. I'm suggesting that Judge Hogan did not consider it necessary to add the declaratory judgment language to the judgment, the court-entered judgment that accompanied this because he said that it was predicated upon what he had done simultaneously. And the language I point to is the conclusion of this lengthy opinion, findings of fact conclusions of law, where he said, for the reason stated, the court declares the action of defendant Alan Contreras in singling out plaintiff's degrees for regulation unconstitutional. He also said the same thing in his order choosing not to add that language to the judgment. That is ER 140. The court declared defendant's past actions violated plaintiff's rights. And so Judge Hogan continually, consistently said that he had entered a declaratory judgment. He said that that was necessary to award the nominal damages that he had awarded. As he was discussing the public benefit arising from the decision, he again referred back to that, saying that he had delineated and clarified the rights. And I point here to his public purpose discussion at ER 133, where he said, the court notes the significant salutary effect achieved by this litigation in that future action by defendants with respect to similarly situated degree recipients will be guided by the constitutional parameters delineated by plaintiff's efforts. In this respect, the success of plaintiff in obtaining a declaration that Contreras' conduct in singling out plaintiff's degree for regulation because of bias toward the viewpoints of the institution from which they were received not only serves to vindicate the harm to plaintiff, but to protect the public at large. In light of the discretion still exercised by Contreras in the Office of Degree Authorization with respect to serious-minded but unaccredited institutions, plaintiff's victory at trial serves a significant purpose. I'll skip a sentence. Her career will always be marked by this occurrence. Obtaining a declaration that her rights were violated serves an important purpose for plaintiff. Let me try to unbundle those. He's identified two advancements or extras beyond the adjudication which led to the $1 nominal damage award. Yes, Your Honor. The first one I can appreciate as a potential public benefit. The state certainly disputes it. I had a discussion with the attorney for the state. I suspect I have a discussion with you about it too, but it has to do with the impact on the commission. The second one, I simply do not understand how that could be anything more than the nominal damage award itself or how this case is different from Farrar or the others because every time you have a $1 nominal damage award, you have to have a determination by the court that there's been a violation of 1983. How does this case differ at all in that respect from the cases where the Supreme Court has said, well, you've got a $1 award, you usually don't get attorney's fees? Well, first, Farrar didn't do so, and second, that's not the general rule of the courts, and so if I may take those in sequence. If you can prescribe me Farrar didn't do so, you may have something, but I didn't read it that way. The circuit's decision in Morales, which is post-Farrar, interpreting Farrar, is the most objective way to deal with what Farrar was doing and not doing, and I would turn here to Morales at page 362. The district court read Farrar as standing for the proposition that zero or low attorney's fees should generally be awarded to Section 1983 plaintiffs who receive damage awards that constitute a relatively small portion of the damages they seek. Beginning of next paragraph, the district court erred in its application of Farrar. Two paragraphs, or next paragraph down, just before the bottom of page 362 of Farrar, in Farrar, the Supreme Court created an exception to the general rule governing a district court's calculation of attorney fees. The court held that nominal damages cases in which relief is de minimis are exempted from the general requirements that govern the calculation of a load star. It goes on to say that Farrar exception, again treating this as very much an exception of the usual rule, which would allow the court to dispense with the calculation of a load star and simply establish a low fee or no fee at all, is limited to cases in which the civil rights plaintiff prevailed but received only nominal damages and achieved only technical success. I would suggest that... It goes on to say Morales didn't receive $1, he received $17. That's correct. However, it then goes on to say, and this is the middle of 363, even if Morales' damages award were nominal, even if it were $1, the Farrar exception would not be applicable here. Whether the plaintiff's success is purely technical or de minimis is determined by examining other factors. And the Ninth Circuit then uses the two O'Connor factors added to what we were discussing earlier about... I don't see how this is answering my question at all, though. I've acknowledged you may have a factor with regard to the commission. What I'm trying to focus on is the second factor identified by the district court, which is the vindication received by the plaintiff. And nothing that you're reading to me explains how this second factor doesn't exist in every single nominal damage case. In Farrar, the court determined that nothing was vindicated. The allegations were $17 million in damages were owed because a conspiracy violated the civil rights of the individual. The only individual who was held liable in the case was not a conspirator. And there was no finding of a conspiracy or that a conspiracy had caused damage to the individual. There was a discrete harm by one other person, which is what permitted the nominal damages award. Nothing further. Judge Hogan, I think, correctly distinguished or recognized the difference from Farrar at ER 132, as he faced the very same argument that Mr. Bushong made here. Quote, in Farrar, the court compared the nominal damages obtained to the $17 million sought. In this case, plaintiff initially did not even seek monetary damages, but primarily sought to challenge the constitutionality of the statutes at issue. And Judge Hogan found that there was a violation as applied to Ms. Benton. And so we don't have, as in Farrar, nothing but nominal damages. And that's why Judge Hogan rejected Mr. Bushong's argument that nothing had been accomplished to benefit anyone. At page ER 133, the significant salutary effect was to diminish, to circumscribe, as I quoted earlier, the discretion of Mr. Contreras and the commission on whose behalf he acted. And was also to enter a judicial decision that Mr. Contreras was not permitted legally to discriminate, to exhibit bias based on his view of the institution. That's why Judge Hogan felt and concluded that that would be a benefit to others as well with similarly situated institutions, meaning those that were serious minded but had not chosen to receive accreditation or had not received accreditation. Judge Clifton, on the second part of your question, which was essentially that the general rule is nominal damages only, no attorney fees, that in fact is not my read of the cases. And beyond Morales, Wilcox takes the same approach to Farrar in viewing it as a very limited exception. Both are post-Farrar decisions. The recent decision that I submitted to the court in Cummings v. Connell, the 2005 decision, while it did remand for recalculation of the attorney fee award, there had been nominal damages there of $1, did not eliminate the attorney fee award. In fact, the implication of the decision is that the court in increasing the nominal damages, the number of people receiving nominal damages, should consider an upward recalculation of attorney fees. Wilcox involved a $1 nominal damages award and upheld attorney fees of $66,000. Hashimoto involved an award of zero, even though there had been a request for nominal damages and upheld attorney fees, and said that the district court properly declined to invoke the Farrar no-fee exception. And then moving to other circuits briefly, the Fourth Circuit in Mercer upheld, in a nominal damages case, $1 awarded, the $300-some-odd-thousand in attorney fees. It cited the First Circuit, this is in Mercer footnote 6, in Diaz-Rivera, a decision that came down after our briefs, the First Circuit awarded only nominal damages, but awarded two-thirds of the requested fees. The Second Circuit in Cabrera, which we cite, involved nominal damages of $1, but said, quote, nominal damages can represent a victory in the sense of vindicating rights, even though no actual damages are proved, and it awarded attorney fees of $335,000. The Eighth Circuit in Murray, which we cite, had a demand of $500,000 damages, an award of nominal damages of $1, and that did not bar a fee award. And finally, the Tenth Circuit in Barber, which we cite, involved an award of nominal damages, but permitted attorney fees. Two of the decisions that he cites, the other side cites, Pouillon and McCardle, which he cites, were declaratory judgment, and so all that there was at all was $1 nominal damages. As he acknowledged in Mr. Contreras' brief at page 33, note 8, What if we disagree with you? I'm not saying I'm going to, but what do we do if there is no declaratory judgment, and no matter what Judge Hogan says in the findings, that does not create a declaratory judgment? Where does that leave your argument? I think it only ends the prologue to my argument and leaves still meeting the fairer Morales-O'Connor test, and that is first the extent of relief granted. Judge Hogan thought he had made a determination that there was a violation of Ms. Benton's constitutional rights of a sort that would benefit others. The second factor, though, is the significance of the legal issues on which the plaintiff prevailed. The district court, in weighing that, this is at ER 70, said that the issues were significant, and this is what he said she prevailed on. The court finds that defendant Contreras' actions violated the plaintiff's First Amendment right to free speech and free exercise of religion. And so there was a significance of legal issues. These are not inconsequential issues, and a determination, whether called a declaratory judgment or not, that Ms. Benton's First Amendment rights were violated. And then the third point, the public purpose the plaintiff's litigation served, does indeed circumscribe the perceived discretion that Mr. Contreras and his office had. And I'd like to come to what that discretion still is. I don't think there's any question. As Mr. Bushong said, there was wide open discretion before the statutory amendment, but the current version of ORS, Section 348.6091D, only contrary to what Mr. Bushong says, that it makes everybody's degrees permissible unless found impermissible by the commission. It's the other way around. It makes all unaccredited degrees impermissible, where they may not be spoken about in the state of Oregon, unless the commission has upheld them. What it says is, that statute says is an institution that, quote, has been found by the commission to meet standards of academic quality comparable, which is the word you asked about, to those of an institution located in the United States that has accreditation recognized by the U.S. Department of Education. That doesn't mean accreditation granted by the U.S. Department of Education, but accreditation by an accrediting body approved by the U.S. Department of Education, to offer degrees of the type and level claimed by that person, which involves a great deal of discretion still. And, again, the statute makes very clear, it's not that all degrees are approved unless disapproved. It's that all unaccredited degrees may not be spoken about unless they have been approved under one of these statutory provisions. Is that the only factor you hang your hat on? The factor that they're going to behave themselves in the future in exercising this discretion? No, sir. Also, the determination that they may not exhibit bias toward an institution, either in enforcement, in selecting out of the, we listed at trial, nearly a thousand degrees on Oregon faculties besides Melinda Benton's that came from unaccredited or foreign institutions. So, selecting among those which to prosecute is something that Mr. Contreras in his office may no longer do, because Judge Hogan has made it clear that that would be a violation of the First Amendment, in addition to circumscribing the discretion. And so, my suggestion would be simply that the Farrer test is met. That, as interpreted by Morales and Wilcox, post-Farrer decisions, it is not at all fatal, even if this court says there was no declaratory judgment. There were only nominal damages, nothing more. And this court would be in keeping not only with those Ninth Circuit decisions, but with most of the other circuits that have specifically addressed that issue of nominal damages and nothing further in the judgment. The three-part test that this circuit has adopted, I would suggest is met at each of the standards. And again, I would remind the court of the standard of review. The standard of review is an abuse of discretion standard, and not a de novo review, except to the extent there is a legal conclusion embedded in the judge's findings otherwise. Now, I'd like to end, if I may, by two things. The first is to say that not only does the Farrer test stand met here, but this circuit's is the continuing rule that a prevailing plaintiff should ordinarily receive fees unless there are exceptional circumstances. We've also made clear that the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained. Certainly, the district court did that when it discussed whether there should be a fee at all. Is it awarded? I think it is, Your Honor, and I think that Judge Hogan did so. Among other things, it was the same document and the same discussion, the same order. When he went through the setting of the fee, he certainly did reduce the application substantially. He did. But he did it based on reducing the rates to make them what he considered the maximum rates. The maximum is 50. And the time that was spent on unproductive activity. Which was across the board, one-third. One-third. I did not see anything that reflected a reduction or even a discussion of this comparison or relationship between the amount of fee awarded and the results obtained. Your Honor, I would just suggest that as you look back at his order, granting fees, that you will find that he was considering the dollar nominal damages and the very direct argument that if you award a dollar nominal damages in the document, caption, judgment, you may not award attorney fees. To go to both the issue of entitlement and amount, and that he very consciously considered it in regard to both. And again, since that is only the exception, the general rule is a prevailing plaintiff should ordinarily obtain or receive fees under Fisher, Friend, and Hashimoto. I see my time is gone, Your Honor, so thank you very much. Thank you. Mr. Powell, to push on? Thank you, Your Honor. I'm going to primarily focus on your concern about the remaining discretion in the agency. If I have time, I'm going to address some of the Ninth Circuit cases that Mr. Byrd mentioned. But I think that's an important point, and that goes to the public purpose factor. And the best way I can explain it, I think, is to let's imagine that the same situation came up today as came up back when Alan Contreras discovered that Ms. Benton was using a degree from an unaccredited institution. Back then, what he did was, hey, this institution is unaccredited, called it to the attention of the community college and said, you can't use that under Oregon law. You have to put an asterisk by the degree as referenced in the college catalog and put down below, unaccredited, which is true, that it is unaccredited. And that's what he did then, and he had that authority then. What he would have to do now, he could call it to the attention of the community college just as he did then, but Ms. Benton could say, wait a minute, my degree is from an institution that meets the same academic standards as those institutions that are accredited. And so the office would be then required to engage in this investigation, this inquiry under the statute, and it's very clear that the statutory terminology requires the commission to make a finding that the institution meets the standards of academic quality that's comparable to what the Department of Education applies. So we go through that process. The statute is worded in such a way as to say, you can be cited unless in one of the unlesses your institution's been found comparable. It doesn't really set it up to say that the commission has to determine that your institution is not comparable and then can cite you. That's correct, that's correct. And if I left you with that impression earlier, I misspoke and I apologize for that. But the real problem here, granted that the previous version of the statute didn't give the comparable type, you're still okay, you're serious-minded even if you don't have the certificate, was really it seemed to be the allegation of bias, even if not nefarious, suggested a selective enforcement kind of problem. And I don't know that the situation on that has changed at all except to add a potential defense to somebody. If the allegation is that, look, there were lots of people with degrees that ran afoul of the statute, but the only person that got picked on is the person that graduated from this school because he didn't like that school, has that changed at all? Only to the extent that there's an additional process added on. At the very beginning, if the Mr. Contreras or whoever makes the, if the commission makes a determination, looks at the college catalogs, as he did in this case, finds degrees that are from institutions that are unaccredited, then he could at that point call it to the attention. And if he chose to say, from institution A, I'm calling it to the attention, but not institution B, even though it's also unaccredited, he could still do that. But what happens next is what's different. And it's the next step that I think has eliminated the possibility of any singling out beyond just calling it to the attention of the community college or the state university that's at issue. I think that's the important point. I see I'm out of time. I would. I have one more question. Are you claiming that the factors that Justice O'Connor set out, we'll call it the O'Connor factors, it need all of them, or one is enough, or some are more important? And I'm particularly, is it enough if you have this third factor, the public policy one, by itself? Dollar plus public policy, is that enough? That's a very difficult question. The first factor, which I, which was identified by the majority, is the most critical factor. We know that, the extent of success. I'm not sure if the third factor alone would be enough. And I'm also not sure how that factor, you know, there is something left of that factor even after the Buckhannon case that got rid of the catalyst theory. I know that because Mercer tells me that, that if you receive a landmark ruling or something that applies across the board, that serves a public purpose, that still could be enough. In Mercer, two of the factors were met, and the first factor was not. So, I know that's enough. Whether one alone, I kind of doubt it, but I think that's something that has not been decided by any case. Thank you. Thank you. Both counsel for the argument. The case just argued is submitted. The next case on the calendar is NMOTION versus Environmental Tectonics Corporation.
judges: Goodwin, Clifton, Rhoades